USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/27/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                         :
AMACHI S. ISIENYI,                         :
                                                         :
                                           Plaintiff,     :                              1:16-cv-902-GHW
                                                         :
                    -against-                   :                              <u>OPINION AND ORDER</u>
                                                         :
INTERACTIVE DATA CORPORATION,    :
                                                         :
                                           Defendant.    :
                                                         :
------------------------------------------------------------------ X

GREGORY H. WOODS, United States District Judge:

     Plaintiff Amachi Isienyi brought this action against Defendant Interactive Data Corporation ("IDC") under Title VII of the Civil Rights Act of 1964, alleging that IDC gave him a poor performance review and later fired him at least in part because of his race and national origin. IDC now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. Because the evidence does not adequately show that the adverse employment actions alleged in Isienyi's complaint were caused in any way by discriminatory intent, IDC's motion is granted.

**I.     BACKGROUND**

     Isienyi was born in New York in 1977 to Nigerian parents. Affirmation of Lauri F. Rasnick, Dkt. No. 47, Ex. D ("Pl.'s Dep.") at 49:14-24. After living in Nigeria, where he attended high school, Isienyi returned to the United States and attended Roosevelt University, where he received a Bachelor's Degree in Computer Science and a Master of Business Administration. Pl.'s Dep. 51:14-25. Since then, Isienyi has independently created various applications and websites, tutored in accounting and finance, worked as a server in banquet halls, answered telephones as a public relations representative, graded tests, and worked at concession stands. Pl.'s Dep. 80:16-86:4. In April 2011, Plaintiff was hired as a software engineer by Interactive Data Managed Solutions

("IDMS"), a wholly owned subsidiary of IDC. Def.'s Rule 56.1 Statement, Dkt. No. 52, ("Def.'s 56.1") ¶ 21.

IDC "work[s] with its clients to design, build, and host customized web-based solutions for market data, and creat[es] mobile apps and desktop terminals designed for use by retail and private banks, investment companies, online brokers, and exchanges." *Id.* ¶ 20. Most of IDC's employees in the United States work on one of four teams: Design, Operations, Project Management, and Development. *Id.* ¶ 23. During the relevant period, Isienyi worked as a software engineer on the Development team, Declaration of Holger Lersch, Dkt. No. 48 ("Lersch Decl.") ¶ 4, and was supervised by, among other people, Holger Lersch and Erik Schmidt, *Id.* ¶ 3; Pl.'s Dep. 99:14-19. Lersch also supervised a number of other employees on the Development team. Def.'s 56.1 ¶¶ 28-29.

In his complaint, Isienyi catalogued various instances where he felt aggrieved as an employee of IDC.[1] He alleged that other members of the Development team received updated workstations six months before he did. Complaint, Dkt. No. 2 ("Compl.") ¶ 3. In April 2014, Plaintiff had a dispute with a coworker from the Design team. Compl. ¶ 4; Def.'s 56.1 ¶ 42. Both parties contacted superiors about the dispute. Compl. ¶¶ 5-6; Def.'s 56.1 ¶¶ 43-45. Plaintiff alleged that Lersch made false statements about him in connection with this incident. Compl. ¶¶ 5-6. Defendant contends that Lersch attempted to resolve the issue, but Plaintiff refused to let it go, and Lersch told Plaintiff that he should not send any further emails on the subject. Def.'s 56.1 ¶¶ 48-49. In the end, Plaintiff was reprimanded for his conduct. Compl. ¶ 6. Isienyi also alleges that Schmidt

---

[1] Defendant notes that although Isienyi did submit a declaration in response to Defendant's motion, it is virtually devoid of facts, and instead makes only conclusory statements. Def.'s Reply Mem., Dkt. No. 57, at 1 ("Def.'s Reply"). However, Defendant does not address the fact that Isineyi verified his complaint by attesting under the penalty of perjury that the statements made therein were true and correct. "A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citing Fed. R. Civ. P. 56(e)).

demanded he "add 'please' and 'as discussed' to" his communications and that Isienyi's "method of speech [was] wrong when [he] used 'cordial' in a sentence during a phone meeting," and required Plaintiff to spell the word. Compl. ¶ 15. Isienyi further alleges that Schmidt refused to provide him necessary and customary guidance when given new assignments.

In September of 2014, Lersch assigned Plaintiff a project to develop a new charting tool. This project required Plaintiff to work with "brand new technologies that no one on the [Development] team had worked with before." Lersch Decl. ¶ 8. Commonly, at IDC when software engineers encountered issues outside of their purview, they sent requests seeking help to other departments at IDC. When Plaintiff sought such help, Lersch accused Plaintiff of "shirking [his] duties." Compl. ¶ 21. Instead of receiving the help necessary to fix a systems issue, Plaintiff's request was rerouted back to him. *Id.*

### a. Plaintiff's 2014 Performance Review

Defendant conducts annual performance reviews for its employees. The review includes an "Overall Performance Rating" and ratings in the categories of Knowledge, Effectiveness, Collaboration, Leadership, and Management (if applicable). Employees receive ratings between "1" (the lowest) and "5" (the highest). A rating of "3" is a "satisfactory rating" and means the employee "meets expectations." Def.'s 56.1 ¶ 78. Isienyi received annual performance reviews in 2012, 2013, and 2014, and each year received an overall performance review rating of 3. *Id.* ¶¶ 77, 79-80. Plaintiff's 2014 performance review, on which he again received an overall rating of 3, but which he nonetheless describes as "dismal," forms the basis for one of Isienyi's claims. Compl. ¶ 43. Under the categories "Effectiveness" and "Collaboration," Plaintiff received a rating of "2." In the Overall Performance Summary, Lersch wrote: "I am not sure, if [Isienyi] is the right person to drive the core product 'HTML Charts' forward. He'd rather be a to-go person for all engineers who use the product. He can explain and support how people should use the product, but I don's [sic] see him

3

as a researcher and developer for the product. At least, not yet. I see potential, but we have to—
and surely will—work hard to make [Isienyi] to [sic] the core chart developer he is supposed to be."
Lersch Decl. Ex. F. Among other comments, Lersch wrote that Isienyi "has a talent in expressing
his doings in words that is really good. He makes a clear point and most people understand what
he's talking about." *Id.*

### b. Termination

In 2014, IDC began to prepare itself to be sold, and decided it would eliminate 62 jobs
across its United States business units, including within IDMS. Def.'s 56.1 ¶ 50. In connection with
these layoffs, IDMS had to eliminate two positions, and decided that one employee from the Design
team and one employee from the Development team would be laid off. *Id.* ¶¶ 51, 53. Isienyi was
chosen to be the employee from the Development team to be laid off, because, according to
Defendant, he was the most recent hire, and was the weakest performer of the five software
engineer candidates on the Development team, among other reasons. Def.'s 56.1 ¶¶ 58, 60.
Notably, the decision to lay off Isienyi was made before the 2014 performance review was
conducted. Lersch Decl. ¶¶ 24, 31.

On January 6, 2015, Defendant terminated Isienyi. Compl. ¶ 45. Defendant offered
Plaintiff a severance payment of $11,363.82 in exchange for a signed separation agreement and
release. Def.'s 56.1 ¶ 85. Plaintiff refused the offered severance. *Id.* ¶ 88.

### c. Procedural History

On February 4, 2015, Isienyi submitted an intake questionnaire to the United States Equal
Employment Opportunity Commission ("EEOC"). Def.'s 56.1 ¶ 1. On March 9, 2015, Plaintiff
filed a Charge of Discrimination with the EEOC alleging discriminatory conduct. *Id.* ¶ 3. On
November 5, 2016, the EEOC issued a Notice of Right to Sue. *Id.* ¶ 4. Isienyi then filed this action
on February 3, 2016 under Title VII of the Civil Rights Act of 1964, 42 U.S.C §§ 2000e – 2000e-17

("Title VII"), alleging that he received a poor performance review and was later terminated because of his race and national origin. Dkt. No. 2. Defendant moved for summary judgment on June 16, 2017. Dkt. Nos. 46-52. Despite receiving a detailed information sheet about parties' obligations at summary judgment entitled "Notice to *Pro Se* Litigant Who Opposes a Motion for Summary Judgment," Dkt. No. 53, Isienyi responded to Defendant's motion with only a declaration in opposition in which he makes formulaic, conclusory objections to certain sections of Defendant's 56.1 Statement, Dkt. No. 54.[2] Defendant submitted a reply in further support of its motion for summary judgment on January 28, 2017. Dkt. Nos. 56-57.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir.

---

[2] Isienyi's declaration in opposition does not contain any material or relevant facts, and instead objects that, *inter alia*, statements in various of Defendant's declarations are "conclusory" and asserts that declarants "did not substantiate" portions of their declarations. *E.g.*, Dkt. No. 54 ¶ 34.

5

2008) (citing *Celotex*, 477 U.S. at 323).  To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and she "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks and citation omitted).  The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted); *see also Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

Where, as here, the party opposing summary judgment is proceeding *pro se*, the Court must construe that party's submissions "liberally and interpret them to raise the strongest arguments that they suggest." *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 536 (2d Cir. 1999) (internal quotation marks and citations omitted).  Proceeding *pro se*, however, "does not . . . relieve [the opposing party] from the usual requirements of summary judgment." *Fitzpatrick v. New York Cornell Hosp.*, No. 00-

6

cv-8594, 2003 WL 102853, at *5 (S.D.N.Y. Jan. 9, 2003). In employment discrimination cases, where direct evidence of intentional discrimination is rare, "affidavits and depositions must be carefully scrutinized for circumstantial proof" of discrimination. *Turner v. NYU Hosps. Ctr.*, 784 F. Supp. 2d 266, 275 (S.D.N.Y. 2011) (citing *Gallo v. Prudential Residential Servs., Ltd. Pshp.*, 22 F.3d 1219, 1224 (2d Cir. 1994)), *aff'd*, 470 F. App'x 20 (2d Cir. 2012). "However, even in such cases, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment and show more than some metaphysical doubt as to material facts." *Id.* at 275-76 (internal quotations omitted) (citing *Schwapp v. Town of Avon*, 118 F. 3d 106 (2d Cir. 1997); *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)). Defendant is entitled to summary judgment unless Plaintiff produces evidence which "reasonably supports a finding of prohibited discrimination." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (citations and quotations omitted).

## III. DISCUSSION

Title VII makes it an "unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. Isienyi alleges that Defendant discriminated against him on the basis of race and national origin when it gave him a negative annual performance review and terminated him.

A plaintiff may prove a discrimination claim either through direct evidence of intent to discriminate or by indirectly showing circumstances giving rise to an inference of discrimination. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). Where, as here, a Plaintiff alleging discrimination under Title VII does not present direct evidence of discriminatory intent, a summary judgment motion is subject to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.

2000) (applying *McDonnell Douglas* framework to Title VII summary judgment motion). Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by demonstrating that: (1) he belonged to a protected class; (2) he was qualified for the position; (3) he experienced an adverse employment action; and (4) the adverse employment action took place under circumstances giving rise to an inference of discrimination. *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251-52 (2d Cir. 2014). "Establishment of a prima facie case 'in effect creates a presumption that the employer unlawfully discriminated against the employee.'" *Adeniji v. Admin. for Children Servs., NYC*, 43 F. Supp. 2d 407, 419 (S.D.N.Y. 1999) (quoting *Fisher v. Vassar College,* 114 F. 3d 1332, 1335 (2d Cir. 1997), *aff'd sub nom. Adeniji v. Admin. For Children's Servs.*, F.3d 430 (2d Cir. 1999); *Texas Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)).

If the plaintiff meets that initial burden, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. *Abrams*, 764 F.3d at 251. If the employer offers such a reason, the presumption of discrimination raised by the *prima facie* case is rebutted, and the burden returns to the plaintiff to point to evidence from which a reasonable jury could conclude that the employer's stated reasons are merely a pretext for unlawful discrimination. *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016).

As an initial matter, it is unlikely that the 2014 performance review constitutes an "adverse employment action." *See e.g., Carmellino v. Dist. 20 of New York City Dep't of Educ.*, No. 03-cv-5942, 2006 WL 2583019, at *3 (S.D.N.Y. Sept. 6, 2006) ("[A] negative performance evaluation—without more—does not ordinarily constitute an adverse employment action for purposes of a discrimination claim." (citations omitted)). "[A]n adverse employment action [is] a 'materially adverse change' in the terms and conditions of employment." *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (citing *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999)). "Examples of such a change include 'termination of employment, a

8

demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). It is not clear why Isienyi characterizes a performance review assigning him the same "satisfactory" grade he had received in both of the preceding two years as "adverse." Furthermore, Isienyi did not provide any evidence showing that any negative consequences—a loss of benefits, a decrease in salary, or even his termination—resulted from the 2014 performance review. Had the performance review led to Isienyi's termination, for example, it could well be considered an adverse employment action, but in point of fact, the decision to lay off Isienyi was made *before* the 2014 performance review was conducted. Lersch Decl. ¶¶ 24, 31. Despite these serious doubts, the Court will assume, *arguendo*, that the 2014 performance review was an "adverse employment action."

"[A] Plaintiff's burden of establishing a prima facie case in the context of employment discrimination law is minimal." *Gaffney v. Dep't of Info. Tech. Telecomm.*, 536 F. Supp. 2d 445, 456 (S.D.N.Y. 2008) (citing *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002)); *Holcomb*, 521 F.3d at 139 (describing plaintiff's prima facie burden as a "low threshold, which the Supreme Court has described as 'minimal.'" (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993))). Here, there are serious questions as to whether Isienyi can meet even this "minimal burden." Nonetheless, the Court will simply assume, *arguendo*, that Isienyi can establish a *prima facie* case of racial and national origin discrimination. *See Idrees v. City of New York*, No. 04-cv-2197, 2009 WL 142107, at *9 (S.D.N.Y. Jan. 21, 2009) (citing cases for the proposition that, "[d]espite the elaborate process set up in *McDonnell Douglas*, Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a *prima facie* case and skip to the final step in the *McDonnell Douglas* analysis, as long as the employer has articulated a legitimate nondiscriminatory reason for the adverse employment action").

9

Assuming Plaintiff has established a *prima facie* case of discrimination based on race and national origin, the burden shifts to Defendant to provide evidence that Plaintiff was terminated "for a legitimate, nondiscriminatory reason." *Holcomb*, 521 F.3d at 140 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). At this stage of the *McDonnell Douglas* framework, it is the Court's "role to determine whether [Defendant] has introduced evidence that '*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason.'" *Id.* at 141 (citing *St. Mary's*, 509 U.S. at 509) (emphasis in original).

Defendant has shown that Isienyi was terminated as part of workforce reduction of a total of 62 employees, Def.'s 56.1 ¶ 50, which included the elimination of two positions in the business unit in which Isienyi worked—one from the Design team and one from the Development team of which Isienyi was a member, *id.* ¶¶ 51-53. When deciding who to eliminate on the Development team, Defendant showed that it considered that Isienyi had worked at IDC for the shortest time, was the weakest performer,[3] had been involved in a dispute with a coworker and behaved unprofessionally afterward, and had job duties that "could be most easily absorbed by the remaining team members." *Id.* ¶¶ 56, 58-61. With respect to Isienyi's 2014 performance review claim—assuming for the sake of argument that the review constituted an adverse employment action—Defendant asserted that the supervisor who conducted the evaluation rated Isienyi's performance a 3, a rating that meant that Isienyi "me[t] expectations," based on Isienyi's self-evaluation, feedback provided by Isienyi's colleagues, feedback from the team lead, and the supervisor's own observations of Isienyi's work performance. Def.'s 56.1 ¶¶ 76-78. These are all legitimate reasons for Isienyi's termination and performance review that are unrelated to Isienyi's membership in protected classes.

---

[3] Specifically, Lersch explained that Isienyi worked at a slower pace than the other four software engineers under Lersch's direct supervision, "missed various client project deadlines," "failed to give the impression that [he] was working quickly and efficiently," was repeatedly delayed and lacked urgency, and "lacked the expected analytical abilities." Lersch Decl. ¶¶ 6-7.

"Where, as here, the employer has stated legitimate, nondiscriminatory reasons for taking an adverse employment action, the plaintiff must make an evidentiary showing sufficient to support a reasonable finding that the adverse action was caused at least in part by discriminatory intent." *Figueroa v. Johnson*, 648 F. App'x 130, 132-33 (2d Cir. 2016) (citing *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015)). "We now ask whether, without the aid of the presumption, [Plaintiff] has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence" that the decision to fire him and to give him a "3" rating on his 2014 performance review were based, at least in part, on the fact the he is black and of Nigerian descent. *Holcomb*, 521 F.3d at 141. "Among the circumstances that may give rise to an inference of racial discrimination are the employer's criticism of the plaintiff's performance in ethnically degrading terms, the employer's invidious comments about others in the employee's protected group, an employer's more favorable treatment of employees outside of the protected group, or the sequence or timing of events leading to the plaintiff's discharge." *Anderson v. Hertz Corp.*, 507 F. Supp. 2d 320, 327 (S.D.N.Y. 2007), *aff'd*, 303 F. App'x 946 (2d Cir. 2008) (citations omitted). As set forth below, the Court concludes that Isienyi has produced no evidence that would allow a reasonable jury to find that Isienyi's race or national origin was a motivating factor in either of the adverse employment acts.

In his deposition, Isienyi identified Lersch and Schmidt as the employees who discriminated against him on the basis of his race or national origin. Pl. Dep. 131:8-12. When asked for the basis of this allegation, Isienyi did not identify any racial remarks or comments or any other piece of evidence, such as comparator evidence. Instead, Isienyi cited various grievances, including that Schmidt: (1) was "quick to say [Isienyi] did not know what [he was] doing," *id.* at 133:6-15, (2) told Isienyi's coworkers he was "incompetent" and did not "know annotations," *id.*, and (3) did not follow "software engineering principles" when working with Isienyi which caused Isienyi to work

11

late nights and on weekends, all of which Isienyi believes caused his negative 2014 performance review, *id.* at 135:14-23.

With respect to Lersch, Isienyi testified that Lersch refused to answer his work-related questions, which Isienyi believed was contrary to the custom among software engineers, *id.* at 136:9-18 ("Sometimes there will be . . . an obstacle and usually we would ask other software engineers have you come across this obstacle before. . . ?"), and instead Lersch told Isienyi to "figure it out because [everyone was] learning," *id.* at 136:19 to 137:6. Though he referenced custom generally, Isienyi did not identify any situations where Lersch treated similarly situated colleagues better or at all differently when asked for assistance. *Id.* at 137:7-23. In any event, Isienyi ultimately received help when he could not "figure it out" on his own. *Id.* at 140:13 to 141:2. These complaints, without more, do not adequately suggest discrimination based on race or national origin.

There is no dispute that these types of perceived slights and interpersonal disputes—both with supervisors and with other coworkers—were frequent in the last year of Isienyi's employment. Indeed, one reason Defendant cited for firing Isienyi is that "he had recently been involved in an altercation with a colleague during which he reacted unprofessionally and inappropriately." Def.'s Mem. of Law at 14 (citing Declaration of Kaushal Amin Decl., Dkt. No. 50 ¶ 20; Lersch Decl. ¶¶ 13-19). Isienyi recounts in his complaint that another conflict occurred when a supervisor "demanded that [he] add 'please' and 'as discussed'" to his communications, and in another instance demanded he spell the word "cordial" after claiming Isienyi used the word incorrectly. Compl. ¶ 15. But these examples, and the other examples Isienyi references, show, if anything, a strained relationship between Isienyi and his coworkers; they have no apparent link to Isienyi's race or national origin, and they therefore cannot give rise to an inference of discrimination. *See Mutts v. S. Connecticut State. Univ.*, 242 F. App'x 725, 727 (2d Cir. 2007) (finding that negative comments by a supervisor, which Plaintiff did not indicate were racially derogatory, were insufficient to give rise to

12

the inference that the alleged adverse employment action was based on Plaintiff's family's race).

Isienyi also failed to produce any evidence showing that similarly situated software engineers were treated differently than he was. In fact, Isienyi only meaningfully discussed other software engineers in the context of how duties were delegated and did not provide evidence of any difference in treatment among similarly situated coworkers. *See Adeniji*, 43 F. Supp. 2d at 425 (granting Defendant's summary judgment motion where plaintiff failed to satisfy his prima facie burden because he "presented no evidence that similarly situated employees of other races and national origins were not transferred to other units or reassigned"); *Kouakou v. Fideliscare New York*, 920 F. Supp. 2d 391, 398-99 (S.D.N.Y. 2012) (stating that allegations of discriminatory conduct do not create an inference that the denial of Plaintiff's transfer request was motivated by his race or national origin "particularly where Plaintiff has not alleged that his employer granted the transfer requests of other similarly situated employees outside of Plaintiffs racial group" (internal quotation and citation omitted)). Isienyi's cursory references to the races and national origins of his coworkers, *e.g.* Compl. ¶ 1 ("Erik Schmidt who is white. . . ."); *id.* ("Holger Lersch who is a white German native. . . ."); *id.* ¶ 6 ("Amin is an Indian. . . .), does not in any way help his claims.

With respect to the 2014 performance review, Isienyi does not point to, and the Court cannot locate, any direct evidence of discrimination, or any comparator or other evidence of discrimination. Plaintiff's "3" rating on his 2014 performance review does not, without more, show pretext. *See e.g., Payne v. State of New York Power Auth.*, 997 F. Supp. 492, 498 (S.D.N.Y. 1998) (granting Defendants' motion for summary judgment where Plaintiff's dispute as to her performance evaluation and subsequent decision to demote her was not supported by evidence of pretext such as hearing or observing anything to indicate the employer "harbored racial animus or had ever treated anyone differently because of race," or "a single instance of racial preference."), *aff'd*, 173 F.3d 845 (2d Cir. 1999). "Furthermore, even if Plaintiff could show that Defendant['s]

13

rating was incorrect or improper, which he has not, this would be immaterial as long as the decision to terminate Plaintiff was not based on discriminatory animus." *Pearson v. Lynch*, No. 10-cv-5119, 2012 WL 983546, at *10 (S.D.N.Y. Mar. 22, 2012) (citing *Lowe v. Commack Union Free Sch. Dist.*, 866 F.2d 1364, 1375 (2d Cir. 1989). Isienyi's testimony at his deposition reinforces the lack of evidence of discrimination. Isienyi repeatedly testified that the basis of his claim that he received a negative performance review because of his race or national origin was that the information contained in the review was false, and the reviewer had written false information because the reviewer "ha[d] discrimination in his mind due to [Isienyi's] race and . . . national origin." Pl.'s Dep. 186:7-11. Isienyi's conclusory statement attributing a discriminatory motive to his colleague is without any concrete evidentiary foundation, and is insufficient to establish pretext or discrimination.

"[A] court does not sit as a super-personnel department to review employers' decisions." *Pearson*, 2012 WL 983546, at *10 (internal quotation marks and citation omitted). Isienyi has established that he had various conflicts with coworkers, that he received a "3" rating on his performance review, and that he was terminated, but he has failed to link these events in any way with his membership in protected classes. More broadly, Isienyi has failed to present any evidence from which a reasonable jury could draw an inference that his termination or negative performance review occurred under circumstances suggesting he was victim of discrimination based on race or national origin, and as a result, he has failed to satisfy his burden to establish a *prima facie* case of discrimination sufficient for his claims to survive the instant motion for summary judgment.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED as to all of Isienyi's claims arising under Title VII.

Having disposed of all federal claims in this action, the Court is required to reexamine its

14

subject matter jurisdiction over the remaining claims.[4]  *See, e.g., ACCD Glob. Agric. Inc. v. Perry*, No. 12-cv-6286 (KBF), 2013 WL 840706, at *1 (S.D.N.Y. Mar. 1, 2013) ("[F]ederal courts are mandated to *sua sponte* examine their own jurisdiction at every stage of the litigation.").

District courts may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). The Second Circuit counsels that, absent exceptional circumstances, federal courts "should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of by summary judgment." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986); *see also Klein & Co. Futures, Inc. v. Bd. of Trade of City of N.Y.*, 464 F.3d 255, 262 (2d Cir. 2006) ("It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims."); *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988))); *Kavit v. A.L. Stamm & Co.*, 491 F.2d 1176, 1180 (2d Cir. 1974) (Friendly, J.) ("If it appears that the federal claims are subject to dismissal under [Rule] 12(b)(6) or could be disposed of on a motion for summary judgment under [Rule] 56, the court should refrain from exercising pendent jurisdiction absent exceptional circumstances.").

As the Supreme Court has explained (and countless courts have repeated), "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of*

---

[4] Though Isienyi did not select New York State Human Rights Law ("NYSHRL") or New York City Human Rights Law ("NYCHRL") claims on his form complaint for employment discrimination, because he is proceeding *pro se*, the Court construes his submissions liberally and interprets them to raise the strongest arguments that they suggest; here, that includes reading into Isienyi's complaint NYSHRL and NYCRHL claims.

*Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Wilson v. Dantas*, No. 12-cv-3238 (GBD), 2013 WL 92999, at *9 (S.D.N.Y. Jan. 7, 2013) ("Non-federal claims . . . are the only ones left. Comity and respect for New York state courts dictate that where possible, state courts should decide matters of state law, and that absent exceptional circumstances, this Court should decline to exercise supplemental jurisdiction over such claims."). The only claims over which the Court has original jurisdiction are Isienyi's Title VII claims, and the complaint does not allege the existence of diversity jurisdiction; to the contrary, it states that Isienyi resided in New York at the time the complaint was filed, and that Defendant was also located in New York. Accordingly, and because the Court finds that no exceptional circumstances exist here,[5] the Court declines to exercise supplemental jurisdiction over Isienyi's NYSHRL and NYCHRL claims.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated: March 27, 2018
New York, New York

GREGORY H. WOODS
United States District Judge

---

[5] Exceptional circumstances may exist where, for example, the remaining state claims are "closely tied to questions of federal policy" or where the federal court has already invested "substantial time and energy" on the state-law issues prior to dismissal of the federal claims. *McLearn v. Cowen & Co.*, 660 F.2d 845, 848 (2d Cir. 1981). They may also exist where federal claims are dismissed only days before trial was set to begin. *See Kolari*, 455 F.3d at 123 n.6. No such circumstances are present here.